Filed 5/31/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SOUTHERN CALIFORNIA EDISON COMPANY, <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF LOS ANGELES COUNTY, <br><br> Respondent; <br><br> 21st CENTURY INSURANCE COMPANY et al., <br><br> Real Parties in Interest. | B333798 <br><br> (Los Angeles County Super. Ct. No. 21STCV18308) |

ORIGINAL PROCEEDING; petition for writ of mandate. Elihu M. Berle, Judge. Petition granted with directions.

Hueston Hennigan, John C. Hueston, Douglas J. Dixon, Padraic Foran, Brandon Marsh; Southern California Edison Company, Belynda B. Reck, Patricia A. Cirucci and Brian Cardoza for Petitioner.

No appearance for Respondent.

Berger Kahn, Craig S. Simon; Grotefeld Hoffman, Adam Romney; Engstrom, Lipscomb & Lack and Gregory P. Waters for Real Parties in Interest.

_____

## INTRODUCTION

California law protects the work product of attorneys and those assisting them in investigating facts related to providing a client legal advice. This case requires that we decide whether a client's statutory obligation to publicly report certain events trumps the protection applicable to attorney work product generated during an internal investigation into facts concerning the reportable event.

Real parties in interest (plaintiffs) are insurance companies that paid policyholders for losses resulting from a conflagration known as the Creek Fire. Plaintiffs claim an arc from the electric powerlines of Southern California Edison Company (SCE) caused the fire and have sued SCE under a subrogation theory to recover their payments to insureds.

During discovery in the subrogation case, SCE withheld certain documents that it asserted were generated during an attorney initiated and directed internal investigation into the cause of the Creek Fire. Plaintiffs moved to compel, arguing the attorney-client privilege and attorney work product doctrine did not exempt these documents from production. Among other things, plaintiffs argued that SCE could not assert privilege and withhold documents because the primary reason SCE conducted the investigation was to comply with state law requiring it to publicly report any involvement it had in causing the fire. The

2

trial court agreed the dominant purpose of the investigation was to comply with public reporting requirements, held the documents thus were not privileged, and compelled production.

We conclude the trial court's order improperly invaded the protection afforded by the attorney work product doctrine. Even where the dominant purpose of an attorney directed internal investigation is to comply with a client's public reporting requirement, attorney work product generated in connection with gathering facts to assist counsel in advising the client on how to comply with that statutory or regulatory reporting requirement remains protected. As plaintiffs have not shown grounds for production of their adversary's work product, the trial court erred in compelling its production. Our conclusion regarding the attorney work product doctrine is dispositive in this matter, and therefore we do address, and express no opinion on, whether the order also violated the attorney-client privilege.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Legal Obligation of Utilities to Investigate and Report Certain Fires to the Public Utilities Commission

Public Utilities Code section 315 requires the Public Utilities Commission (PUC or commission) to "investigate the cause of all accidents occurring within this State upon the property of any public utility or directly or indirectly arising from or connected with its maintenance or operation, resulting in loss of life or injury to person or property and requiring, in the judgment of the commission, investigation by it." The statute also requires public utilities to "file with the commission, under such rules as the commission prescribes, a report of each accident so occurring." (Pub. Util. Code, § 315.)

3

In turn, PUC General Order 95, section 1, rule 17 (PUC rule 17) requires utilities such as SCE to "establish procedures for the investigation of major accidents and failures for the purpose of determining the causes and minimizing the possibility of recurrence." The rule defines "major accidents and failures" as "[i]ncidents associated with utility facilities which cause property damage estimated at or about the time of the incident to be more than $50,000" and "[i]ncidents resulting from electrical contact which cause personal injury which require hospitalization overnight, or result in death." (*Ibid.*)

PUC also requires utilities to notify it within two hours of an incident during normal working hours or within four hours outside of normal working hours, and to submit, within 20 business days, "a written account of the incident which includes a detailed description of the nature of the incident, its cause and estimated damage." (Pub. Util. Com. Final Resolution E-4184 (Aug. 21, 2008) Decision No. 06-04-055, App. B.) PUC defines " '[r]eportable incidents' " as "those which: (a) result in fatality or personal injury rising to the level of in-patient hospitalization and attributable or allegedly attributable to utility owned facilities; or (b) are the subject of significant public attention or media coverage and are attributable or allegedly attributable to utility facilities; or (c) involve damage to property of the utility or others estimated to exceed $50,000." (*Ibid.*) PUC rule 17 provides, "Nothing in this rule is intended to extend, waive, or limit any claim of attorney client privilege and/or attorney work product privilege."

4

**B.    The Creek Fire and Events Leading to Plaintiffs'
    Lawsuit Against SCE**

The Creek Fire ignited on December 5, 2017 in Los Angeles
County, and damaged multiple properties before being
extinguished.  On December 11 and 12, 2017, counsel for several
of the plaintiffs sent evidence preservation letters to SCE
asserting that they believed SCE's equipment likely contributed
to the ignition and spread of the fire.  The Department of
Forestry and Fire Protection (CalFire) notified SCE on
December 14, 2017 that its investigation of the fire's area of
potential origin did not include SCE facilities.  CalFire
nonetheless requested SCE provide information regarding some
of its facilities and SCE responded.

The U.S. Department of Agriculture Forest Service (USFS)
investigated and prepared a report dated January 13, 2018, in
which it concluded the cause of the fire was Los Angeles
Department of Water and Power (LADWP) electrical
transmission lines.[1]  In 2018, a lawsuit was filed against LADWP
for allegedly causing the Creek Fire and, on or about July 21,
2020, a subpoena was served on SCE seeking data regarding
specific elements of SCE's electrical system in the area of the fire,
including what the parties call the "Lopez Circuit."

Although the details are not part of the record, it appears
that in June 2019 SCE was sued for contributing to the Creek
Fire's ignition and spread.  SCE submitted an accident report to

---

[1] According to plaintiffs, this report was not made public
until April 2020.  The United States later sued SCE in 2023 for
damage to national forest lands, fire suppression costs, and other
damages, alleging that SCE's negligence caused the Creek Fire.

PUC regarding the fire on December 11, 2020—just over three years after the fire began and well beyond the 20 business days required by PUC. Scott Hayashi, a senior advisor in SCE's claims department, wrote in the report that it was being made "under Public Utilities Code [s]ection 315 because litigation has been filed and served on SCE in which it is alleged that damage to third-party property is attributable to SCE facilities." The report indicated that USFS initially investigated the cause and origin of the fire and determined that SCE facilities were not involved. The report stated, "Given the allegations in the litigation, SCE is evaluating activity on the Lopez [C]ircuit, including a branch line fuse operation outside the vicinity of the origin of the fire and elevated amperage readings on the circuit on December 5, 2017."

Plaintiffs filed their initial subrogation complaint against SCE on May 14, 2021. A master subrogation complaint filed on April 18, 2022, which plaintiffs joined, alleged that an electrical arc on SCE's Lopez Circuit "ignite[d] nearby trees, brush, and vegetation giving rise to the Creek Fire."

## C.     SCE's Withholding of Documents from Production

During discovery in the subrogation case, SCE withheld certain documents, primarily emails, which it claimed were created as part of an investigation of the Creek Fire initiated by its in-house counsel. SCE asserted the documents were protected by the attorney-client privilege and the attorney work product doctrine. A subset of these documents (108 in total), dated from between December 7, 2017 and June 29, 2021, are relevant here. The documents at issue include emails between employees in SCE's claims department (Claims employees) on which no attorney was copied, emails between Claims employees and SCE

6

employees in other non-legal departments, and emails that did not include any Claims employees or attorneys. Also included are two documents purportedly drafted or edited by Hayashi, and a third described only as an "[e]mail or document reflecting communication with SCE [l]egal."

## D.     Plaintiffs' Motion to Compel

Plaintiffs moved to compel production of these 108 documents. Plaintiffs contended that the dominant purpose of SCE's investigation was to comply with its legal reporting obligation to PUC, and thus the investigation could not be privileged because PUC mandated reports are public. Plaintiffs further argued that Claims employees typically filed incident notifications with PUC without legal review, and SCE attorneys generally did not supervise Claims employees as those employees worked mostly on matters where litigation was not anticipated. Noting that SCE was not sued until June 2019, plaintiffs also argued that it was "not plausible" that SCE's investigation (which began shortly after the fire started) was in anticipation of litigation and instead was to respond to requests from government agencies such as USFS, CalFire, and PUC.

Plaintiffs contended that SCE's failure to produce the documents thwarted their efforts to discover information showing SCE knew it had caused the Creek Fire, had failed to comply with its PUC reporting obligation, and did not "accurately respond to official investigations of the origin and cause of the Creek Fire" by USFS, PUC, and CalFire.

## E.     SCE's Opposition to the Motion to Compel

SCE opposed the motion to compel, contending that the documents "were created as part of the SCE [l]aw [d]epartment's investigation into the Creek Fire, for the purpose of rendering

7

legal advice and in anticipation of litigation." SCE further disputed that it had withheld any relevant information from CalFire, PUC, or USFS.

Brian Cardoza, SCE's lead claims trial attorney, submitted a declaration in which he averred that, on December 5, 2017, he "directed SCE's [c]laims [d]epartment to conduct a privileged and confidential internal investigation of the Creek Fire for the purpose of assessing SCE's potential legal liability in anticipation of future litigation." According to Cardoza and other SCE witnesses, SCE's claims department and its law department are both part of SCE's "[l]egal [o]rganization." Cardoza stated that he initiated "th[e] investigation in order to facilitate the provision of legal advice" on several topics, including "potential regulatory action related to the fire" and "evaluations of potential company risk and monetary liability in litigation or through regulatory action."

Cardoza declared, "SCE is routinely sued after a wildfire incident even when SCE facilities are not involved in the ignition. Accordingly, SCE's attorneys regularly undertake confidential and privileged investigations after fires in order to procure legal advice in anticipation of litigation." SCE also submitted copies of the evidence preservation letters sent to SCE by plaintiffs' attorneys within a week of the fire which asserted that SCE's equipment either "likely" or "may have" "contributed to the ignition and spread of" the Creek Fire.

Cardoza averred that he "directed the [c]laims [d]epartment to report all investigation results to Leon Bass, SCE [d]irector and [m]anaging [a]ttorney [c]laim [l]itigation." He further averred that he had reviewed all of the communications at issue and "underst[ood] that each . . . was made as part of and

8

in furtherance of the investigation that SCE's [l]aw [d]epartment directed the [c]laims [d]epartment to perform in anticipation of litigation." According to Cardoza, "During the Creek Fire investigation, the [c]laims [d]epartment worked with the [l]aw [d]epartment and outside counsel to help gather facts, communicate with subject-matter experts, and interpret technical data and information, all to facilitate the attorneys' rendering of legal advice." Cardoza stated that he "regularly spoke with Robert Ramos, Scott Hayashi, and other members of the [c]laims [d]epartment regarding their findings."

Hayashi averred in a declaration, "The [c]laims [d]epartment regularly conducts investigations at the request of counsel and on the [l]aw [d]epartment's behalf, in order to assist attorneys in the rendering of legal advice, and in anticipation of litigation after wildfires." Hayashi stated that "[b]eginning on December 5, 2017," Cardoza directed the claims department to conduct such an investigation regarding the Creek Fire, and he described the role of the claims department consistent with Cardoza's declaration. Hayashi testified at deposition that he spoke in the presence of a lawyer within 10 days after the fire began but could not recall which lawyer. Hayashi was a sender or recipient on 102 of the 108 documents at issue, and averred that all the communications were made "as part of and in furtherance of the investigation."

Ramos, "the highest-ranking employee in" the claims department, authored a declaration mirroring Hayashi's. Ramos testified at deposition that he is not a technical expert concerning electrical systems, so he relies on "subject matter experts" to obtain information.

9

SCE contended that the documents were attorney-client privileged and entitled to both absolute and qualified protection under the attorney work product doctrine. It asserted that its obligation to report to PUC was irrelevant, noting that PUC rule 17 preserved attorney-client privilege and work product protections with respect to a utility's investigation into a fire. It also argued that, even if the investigation related to its disclosure obligations, the attorney-client privilege and work product doctrine could still apply. SCE further contended that the attorney-client privilege and attorney work product doctrine could protect communications between non-attorneys.

## F.   The Court's Ruling and SCE's Writ Petition

On November 17, 2023, after hearing oral arguments, the trial court granted the motion to compel. As to the claim of attorney-client privilege, the court noted that none of the documents was sent to or from SCE counsel. As for the attorney work product claim, the court concluded "SCE has not shown that the documents at issue involve opinions, communications, impressions, conclusions, or legal research or theories of any attorney," stating, "All that has been shown is that these documents involve communications and impressions among investigators or employees, that is, non-attorneys." The court also found that SCE had not "adequately establish[ed]" that the Claims employees and other SCE employees were acting as agents for SCE counsel. It accepted plaintiffs' argument that the investigation's dominant purpose was not legal advice, stating "[it] defies logic to accept that the dominant purpose of [the SCE employees'] investigation into the Creek Fire was simply to aid counsel in advising SCE of its legal rights and responsibilities and not a critical business decision to prevent further chaos to its

10

customers, [and] most importantly, to comply with its legal requirement [as a] highly-regulated entity, that is, to determine the cause of the fire and minimize the possibility of reoccurrence." While acknowledging that the withheld documents "may have relevance to some future yet still nonexistent lawsuit" when they were created, the court found the documents were related to "legal compliance," which it characterized as "a business purpose," and which, in the court's view, "dominate[d] over anticipated litigation."

The court found the documents at issue discoverable, stating that they concerned "circuit irregularities [that] would no doubt give a clear picture as to the causation of the Creek Fire, the scope of liability, and ultimately, as the sequence of events suggest, that SCE made a deliberate decision at various stages of its investigation to sidestep unfavorable evidence and/or allow blame to be placed on the LADWP."

SCE thereafter filed a petition for writ of mandate or prohibition in this court, contending the trial court erred in granting plaintiffs' motion to compel. We issued an order to show cause why a peremptory writ of mandate should not issue directing the trial court to vacate its order and enter a new order denying plaintiffs' motion to compel, and plaintiffs and SCE fully briefed the question.[2]

---

[2] Plaintiffs did not verify their response to the writ petition, and SCE contends that we should therefore strike plaintiffs' return. Because plaintiffs' response is not verified, "all well-pleaded and verified allegations of the writ petition are accepted as true. [Citations.]" (*Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1084.) However, we decline to

## DISCUSSION

### A.    Standard of Review

" '[W]here the petitioner seeks relief from a discovery order that may undermine a privilege, we review the trial court's order by way of extraordinary writ.' [Citation.]" (*Doe 2 v. Superior Court* (2005) 132 Cal.App.4th 1504, 1515.)

"A trial court's determination of a motion to compel discovery is reviewed for abuse of discretion. [Citation.] An abuse of discretion is shown when the trial court applies the wrong legal standard. [Citation.] However, when the facts asserted in support of and in opposition to the motion are in conflict, the trial court's factual findings will be upheld if they are supported by substantial evidence. [Citations.]" (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733 (*Costco*).) "[W]e apply independent review to the trial court's conclusions as to the legal significance of the facts." (*City of Petaluma v. Superior Court* (2016) 248 Cal.App.4th 1023, 1031.)

### B.    The Attorney Work Product Doctrine

California law shields the "work product" of an attorney from disclosure in litigation. The legislative policy for affording this protection is to "[p]reserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases"

---

strike plaintiffs' response and will address the merits of SCE's petition. (See *County of San Bernardino v. Superior Court* (1994) 30 Cal.App.4th 378, 382, fn. 6 [addressing the merits of a writ petition despite the " 'responsive brief' " not being a proper return to the court's order to show cause].)

12

(Code Civ. Proc.,[3] § 2018.020, subd. (a)) and "[p]revent attorneys from taking undue advantage of their adversary's industry and efforts" (*id*., subd. (b)).  To that end, subdivision (a) of section 2018.030 describes what is known as "absolute" work product protection, while subdivision (b) describes "qualified" protection. "A writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances." (*Id*., subd. (a).)  Any attorney work product that does not reflect counsel's impressions, conclusions, opinions, or legal research or theories "is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (*Id*., subd. (b).)

"[T]he Legislature in enacting section 2018.030 did not define 'work product' and instead left the term open to judicial interpretation." (*Coito v. Superior Court* (2012) 54 Cal.4th 480, 494 (*Coito*).)  Courts have defined attorney work product as "the product of the attorney's ' "effort, research, and thought in the preparation of his client's case.  It includes the results of his own work, and the work of those employed by him or for him by his client, in investigating both the favorable and unfavorable aspects of the case, the information thus assembled, and the legal theories and plan of strategy developed by the attorney—all as reflected in interviews, statements, memoranda, correspondence, briefs, and any other writings reflecting the attorney's 'impressions, conclusions, opinions, or legal research or theories' and in countless other tangible and intangible ways." ' " (*Meza v.*

---

[3] All unspecified statutory references are to the Code of Civil Procedure.

13

*H. Muehlstein & Co., Inc.* (2009) 176 Cal.App.4th 969, 977, quoting *BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240, 1253-1254, fn. 4; see *Citizens for Ceres v. Superior Court* (2013) 217 Cal.App.4th 889, 911 ["Work produced by an attorney's agents and consultants, as well as the attorney's own work product, is protected by the attorney work product doctrine."].)

Work product protection applies when an attorney acts in a litigation or "nonlitigation legal capacity." (*Rumac, Inc. v. Bottomley* (1983) 143 Cal.App.3d 810, 815-816.) Further, "the work product privilege is not limited to documents prepared in anticipation of litigation but also applies to the work product of an attorney generated in his [or her] role as *counselor.*" (*Aetna Casualty & Surety Co. v. Superior Court* (1984) 153 Cal.App.3d 467, 478-479.) The privilege can also apply where an attorney is fact-finding, because " '[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant.' [Citation.]" (*City of Petaluma v. Superior Court, supra*, 248 Cal.App.4th at p. 1034.)

"The work product privilege is held by the attorney, not the client." (*Curtis v. Superior Court* (2021) 62 Cal.App.5th 453, 468.) An attorney seeking to invoke work product protection has the burden to show that materials are either absolute or qualified work product. (*Coito, supra*, 54 Cal.4th at pp. 486, 495-496; *BP Alaska Exploration, Inc. v. Superior Court, supra*, 199 Cal.App.3d at p. 1252.) If material is entitled to only qualified work product protection, the party seeking the material "has the burden of establishing that denial of disclosure will unfairly prejudice the party in preparing its claim or defense or will result in an

14

injustice." (*Coito*, *supra*, 54 Cal.4th at p. 499; *Citizens for Ceres v. Superior Court*, *supra*, 217 Cal.App.4th at p. 912.)

A trial court "may not require disclosure of information claimed to be . . . [absolute] attorney work product" to rule on the claim. (Evid. Code, § 915, subd. (a).) However, a court can require an in camera review of materials claimed to be protected as qualified work product where it is unable to determine the discoverability of those materials without such a review. (*Id.*, subd. (b).)

## C. The Trial Court Abused its Discretion in Ruling that the Documents Were Not Entitled to At Least Qualified Attorney Work Product Protection

The documents at issue, which SCE provided substantial evidence were prepared as part of an attorney led internal investigation, are the type of materials typically entitled to work product protection. Our Supreme Court's decision in *Coito* is instructive. The court addressed whether witness statements taken by investigating agents on behalf of the state agency's attorney were protected work product. (*Coito*, *supra*, 54 Cal.4th at pp 487, 500.) The court first held that a witness statement obtained from an interview, whether conducted by an attorney "or by an attorney's agent at the attorney's behest" (*id.* at p. 494), "may, in some instances, reveal the 'impressions, conclusions, opinions, or legal research or theories' of the attorney and thus be entitled to absolute protection." (*Id.* at p. 495, quoting § 2018.030, subd. (a).) The court then held that, even where absolute protection is inapplicable, such a witness statement "is, as a matter of law, entitled to at least qualified work product protection." (*Coito*, *supra*, at p. 497.) In reaching this latter conclusion, the court reasoned that leaving such documents

15

unprotected would "undermine[ ] the Legislature's policy to '[p]revent attorneys from taking undue advantage of their adversary's industry and efforts' " (*id.* at p. 496, quoting § 2018.020, subd. (b)), and "impede the Legislature's intent 'to encourage [attorneys] to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases' " (*Coito, supra,* at p. 496, quoting § 2018.020, subd. (a)).

Here, SCE adduced evidence that its in-house counsel directed Claims employees to obtain information from employees referred to as "subject-matter experts" in other departments. Communications from these subject-matter experts to Claims employees would contain information regarding the Creek Fire and/or SCE's equipment, and thus be witness statements like those at issue in *Coito.* Under *Coito*, these communications, as well as other communications and documents relating to the interview process, are at least entitled to qualified work product protection.

We discern two grounds for the trial court's ruling that the work product doctrine did not apply: that SCE failed to establish that its Claims employees were agents of SCE counsel, and that the dominant purpose of the investigation was compliance with SCE's legal obligation under Public Utilities Code section 315 and PUC rule 17 to investigate the fire and report on it to PUC. The first finding is not supported by substantial evidence, and the conclusions the court drew from its second finding are legally flawed.

1.     *Agency*

It is well-established that the work product doctrine " ' "includes . . . the work of those employed by [an attorney] or for

16

him by his client, in investigating both the favorable and unfavorable aspects of the case." ' " (*Meza v. H. Muehlstein & Co., Inc., supra*, 176 Cal.App.4th at p. 977.) SCE submitted multiple declarations establishing that attorney Cardoza instructed the claims department to investigate the cause of the Creek Fire to assist in providing legal advice to SCE, and that the documents at issue were "part of and in furtherance of" that investigation. Other documents on which attorneys were copied and as to which plaintiffs did not move to compel corroborated attorney involvement in this investigation. Plaintiffs did not adduce any conflicting evidence, and the court's ruling does not identify any.

In support of the court's ruling, plaintiffs point to evidence they claim demonstrates that "the [c]laims [d]epartment investigates a wide variety of matters, including customer complaints and job safety claims, where there is no anticipation of litigation." The evidence they cite—excerpts from a deposition Ramos provided in 2013 in a different lawsuit—does not support their assertion. More importantly, even if Claims employees do typically work on matters where litigation is not anticipated, that does not lead to the reasonable inference that they never handle other assignments where litigation is anticipated.

Plaintiffs also claim "SCE's general counsel does not actively supervise [c]laims [d]epartment investigations," citing Ramos's 2013 deposition testimony that one SCE attorney named Swartz (who was not a declarant in opposition to the motion to compel) did not "actively" supervise such investigations. This 2013 statement in another case does not create a reasonable inference that four years later an attorney other than Swartz (here, Cardoza) and other SCE attorneys would not have

17

supervised Claims employees in a specific, potentially significant matter. Nor do plaintiffs explain what they mean by "actively" supervise or identify any requirement that an attorney must exercise a particular level of supervision over an investigation for work product protection to apply.

Plaintiffs also contend they adduced evidence that "SCE's claims personnel are responsible for filing notifications with the PUC 'as a matter of practice' without involving legal counsel, and generally do not submit PUC filings to counsel for review." Their support for this claim is deposition testimony from one Claims employee that it was his job to submit electronic safety incident reports (ESIR) to PUC and he did not need approval from an attorney. However, with regard to the Creek Fire, that employee testified that he *did* consult with counsel before submitting an ESIR.

" 'Substantial evidence is a deferential standard, but it is not toothless.' [Citation.] ' " 'We may not uphold a finding based on [no evidence or] inherently improbable evidence . . . .' " ' [Citation.]" (*Lee v. Amazon.com, Inc.* (2022) 76 Cal.App.5th 200, 222.) As no substantial evidence supported the court's finding that counsel did not deputize the claims department to assist in investigating the cause of the Creek Fire to facilitate counsel's provision of legal advice to SCE, we reject the court's finding that there was no agency relationship for purposes of the work product doctrine.

2. *Dominant Purpose*

The trial court also held the attorney work product doctrine was inapplicable because the dominant purpose of SCE's investigation was to satisfy SCE's obligation under Public Utilities Code section 315 and PUC rule 17 to investigate the

18

cause of the fire and report to PUC.  The dominant purpose test was developed in the context of the attorney-client privilege (see *Costco*, *supra*, 47 Cal.4th at pp. 734-736), and our Supreme Court has not weighed in on whether it applies to work product claims. Fellow Courts of Appeal have done so, albeit generally without discussion as to the sometimes differing issues at stake in the work product context.  (E.g., *2,022 Ranch v. Superior Court* (2003) 113 Cal.App.4th 1377, 1390-1395, 1401, disapproved on another ground in *Costco*, *supra*, 47 Cal.4th at p. 739; *Wellpoint Health Networks, Inc. v. Superior Court* (1997) 59 Cal.App.4th 110, 112; *Aetna Casualty & Surety Co. v. Superior Court, supra*, 153 Cal.App.3d at pp. 475-476; *Watt Industries, Inc. v. Superior Court* (1981) 115 Cal.App.3d 802, 805.)  Assuming without deciding that the dominant purpose test applies to whether something constitutes work product, the governing question is what was the dominant purpose for counsel's retention: legal advice, or a non-legal reason?  (*Costco*, *supra*, 47 Cal.4th at pp. 735-736.)

The trial court found the dominant purpose of the investigation was to ensure compliance with SCE's legal requirements as a highly-regulated entity.  From that it reasoned counsel were thus involved for a non-legal business purpose, a conclusion that does not follow.  Counsel's involvement here to ensure corporate compliance with legal reporting requirements *was* a legal role, not a non-legal one, particularly in the face of the uncontradicted evidence as to why counsel got involved with the investigation.  Indeed, PUC rule 17 expressly acknowledges that a utility may consult with counsel in conducting the required investigation, providing, "Nothing in this rule is intended to

19

extend, waive, or limit any claim of attorney client privilege and/or attorney work product privilege." (PUC rule 17.)

The trial court's approach suggests that when attorneys advise on legal reporting obligations, they do so for a non-legal business purpose. We disagree. California companies are faced with myriad statutory and regulatory reporting and disclosure obligations under both federal and state law. To comply with those obligations and avoid unnecessary liability they often seek advice from attorneys. That advice can include not only how and what to report, but also whether one has a reporting or disclosure obligation in the first place. Sound legal advice requires knowing the applicable facts (good and bad) to determine whether one has a reporting obligation, and, if so, how best to comply with it. A company's need to comply with a public reporting requirement does not eviscerate work product protection; if it did, much of what a lawyer does as part of advising organizational clients would lose the work product protection to which it is entitled.

In this case, there is no evidence that SCE's in-house counsel was acting in a business, as opposed to legal, capacity. SCE's counsel Cardoza averred that the investigation facilitated "the provision of legal advice" on five topics: "(1) potential legal risks caused by the fire; (2) potential regulatory action related to the fire; (3) potential legal strategies for mitigating risk; (4) evaluations of potential company risk and monetary liability in litigation or through regulatory action; and (5) consideration of potential measures to be taken to minimize or avoid the risks of future litigation or adverse regulatory action arising from similar incidents." All five categories are appropriate topics for legal advice. Plaintiffs contend that three of these subjects (the second, third and fifth) related to a "business purpose." As

20

explained above, SCE could properly seek legal advice in connection with those subjects. Indeed, given the significant potential legal exposure SCE faced from the Creek Fire in terms of regulatory action, government claims, and civil litigation, one would expect SCE to seek legal advice regarding its role (if any) in causing the fire.

Although work product protection does not require the anticipation of litigation (*Aetna Casualty & Surety Co. v. Superior Court*, *supra*, 53 Cal.App.3d at pp. 478-479), we further disagree with the trial court that the timing of the investigation (before any litigation had been filed) created the inference that it could not have been related to anticipated litigation. Given that the Creek Fire occurred in the vicinity of SCE's electrical distribution lines, it was reasonable for SCE to believe that litigation was likely. Indeed, SCE received evidence preservation letters from plaintiffs' counsel within a week of the fire.

Applying work product protection to investigations such as the one at issue here advances an important policy behind the doctrine, namely, to allow attorneys the freedom "to investigate not only the favorable but the unfavorable aspects" of a client's situation, and in turn will promote more accurate and effective investigations. (§ 2018.020, subd. (a).) As the court in *In re Kellogg Brown & Root, Inc.* (D.C.Cir. 2014) 756 F.3d 754 noted, businesses in "a significant swath of American industry" are now "required by law to maintain compliance programs," and, if investigations conducted under such programs were subject to disclosure in litigation, "businesses would be less likely to disclose facts to their attorneys and to seek legal advice, which would 'limit the valuable efforts of corporate counsel to ensure their client's compliance with the law.' " (*Id.* at p. 759.)

21

**D.** **Plaintiffs Did Not Demonstrate Entitlement to Production of SCE's Qualified Attorney Work Product**

Having concluded the 108 documents are at least qualified work product, we now turn to whether plaintiffs were nevertheless entitled to their production. Qualified work product is not subject to disclosure "unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (§ 2018.030, subd. (b).) "[A] showing that a witness is no longer available or accessible, or some other showing of unfair prejudice or injustice" is necessary to overcome qualified work product protection. (*Coito, supra*, 54 Cal.4th at p. 496.)

Here, the trial court accepted plaintiffs' claims that SCE delayed in notifying PUC that there were elevated amperage readings on its Lopez Circuit on the day of the fire, and failed to provide this data to CalFire, all of which led USFS to come to the incorrect conclusion that LADWP transmission lines had caused the fire. It found that the documents regarding "circuit irregularities would no doubt give a clear picture as to the causation of the Creek Fire, the scope of liability, and ultimately, as the sequence of events suggest, that SCE made a deliberate decision at various stages of its investigation to sidestep unfavorable evidence and/or allow blame to be placed on the LADWP."

These findings are insufficient to justify disclosure of qualified work product. Section 2018.030, subdivision (b) requires a showing not just of relevance, but that plaintiffs would be "unfairly prejudice[d] . . . in preparing" their case, or that

nondisclosure would "result in an injustice." The court made no such finding, nor did plaintiffs establish they were unfairly prejudiced or that "an injustice" would result if they were denied access to SCE's work product. Plaintiffs argue they "suffered unfair prejudice in the form of their inability to fully rebut SCE's defense that LADWP was responsible for the Creek Fire." This contention fails because plaintiffs concede they have obtained the information SCE allegedly withheld from CalFire and PUC, namely, data regarding elevated amperages and alleged faults on the Lopez Circuit,[4] and have not demonstrated any inability to take discovery of fact witnesses on which SCE bases its defense to the subrogation claims.

We also note the April 18, 2022 master complaint, which plaintiffs joined, alleges that SCE's failure to disclose the elevated amperages and faults on the Lopez Circuit "likely resulted in fire investigators failing to search for, document, secure, and/or otherwise preserve crucial physical evidence that the Creek Fire was caused by SCE infrastructure." Speculation about why third parties did or did not take certain actions does

---

[4] The April 18, 2022 master complaint, which plaintiffs adopted, alleges "SCE failed to disclose [to public fire investigators] the data showing that its infrastructure in the vicinity of the origin of the Creek Fire suffered multiple elevated amperage/fault events which caused operation of fuse(s)," and that "[m]ore complete data was subsequently produced to [s]ubrogation [p]laintiffs as part of this litigation . . . ." In addition, plaintiffs asserted in their motion to compel that they "forced SCE to produce the fault records that clearly demonstrate SCE equipment started the Creek Fire."

23

not establish actual prejudice or unfairness compelling production of SCE's attorney work product.

Finally, plaintiffs argue that SCE's withholding of the 108 documents has "adversely impacted [p]laintiffs' discovery into SCE's failure to meet statutory requirements to timely and accurately respond to official investigations of the origin and cause of the Creek Fire." By definition the non-production of documents on work product grounds has some adverse impact on discovery; after all, it means the documents are not discoverable. (See *Costco*, *supra*, 47 Cal.4th at p. 732 [the exercise of privilege " 'may occasionally result in the suppression of relevant evidence' "].) Without more, such an adverse impact therefore cannot suffice to show prejudice or unfairness, as it occurs whenever privilege applies.

As we conclude the trial court abused its discretion in failing to apply at least qualified work product protection to the documents at issue and ordering the documents to be disclosed, we do not address (and express no opinion on) whether the court erred in finding the documents were not absolute work product. In addition, as noted above, we do not express any opinion on whether the court abused its discretion in finding the documents were not protected by the attorney-client privilege.

## DISPOSITION

The order to show cause is discharged, and the petition is granted. Let a preemptory writ of mandate issue directing the trial court to vacate the November 17, 2023 order directing SCE to produce records in Los Angeles Superior Court case No. 21STCV18308, entitled *21st Century Insurance Company et al. v. Southern California Edison Company*, and to issue a new and different order denying the request to produce records on the

24

grounds the records are protected attorney work product.  SCE is awarded its costs incurred in this writ proceeding.

CERTIFIED FOR PUBLICATION


WEINGART, J.


We concur:



CHANEY, J.



BENDIX, Acting P. J.


25